

**FILED**

**DEC 11 2012**

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

|  |  |
|---|---|
| ASSISTED HOUSING SERVICES CORP.; NORTH TAMPA HOUSING DEVELOPMENT CORP.; CALIFORNIA AFFORDABLE HOUSING INITIATIVES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **12-862 C** _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Assisted Housing Services Corp., ("AHSC"), North Tampa Housing Development Corp. ("NTHDC"), and California Affordable Housing Initiatives, Inc. ("CAHI"), by and through their undersigned counsel, file this complaint for declaratory and injunctive relief and alleges as follows:

## NATURE OF THE CASE

1.      Plaintiffs AHSC, NTHDC, and CAHI bring this action to set aside and enjoin the decision by Defendant, the United States, acting by and through the Department of Housing and Urban Development ("HUD" or "Agency"), to ignore the General Accountability Office's ("GAO") recommended corrective action in Matter No. B-406738 *et al.* AHSC, NTHDC and several other local public housing authorities from around the country filed GAO bid protests challenging HUD's decision to solicit performance-based contract administration ("PBCA") services in support of its Project-Based Section 8 rental

housing assistance program through cooperative agreements rather than through procurement

contracts. In its decision issued August 15, 2012, GAO recommended that, under the Federal

Grant and Cooperative Agreement Act, "HUD cancel the [Notice of Funding Availability,

which solicited applications for the purported cooperative agreements], and solicit the

contract administration services for the Project-Based Section 8 rental assistance program

through a procurement instrument that will result in the award of contracts." Exhibit 1, GAO

Decision, p. 15. (All exhibits cited in this Complaint are appended to the Declaration of Neil

H. O'Donnell.)

2.     On December 3, 2012, HUD announced that it would override GAO's

recommendation, stating: "The Department has decided to move forward with the 2012

PBCA NOFA and plans to announce awards on December 14, 2012." Exhibit 2, HUD

NOFA Information Website, p. 1.

3.     Plaintiffs will be irreparably harmed by that action in that by the terms of the

NOFA they are not given a fair opportunity to compete for this work, which should have

been solicited as procurement contracts subject to the Competition in Contracting Act, 41

U.S.C. §3301(a)(1).

## JURISDICTION AND STANDING

4.     This Court has jurisdiction over this matter under the Tucker Act, 28 U.S.C. §

1491(b).

5.     The remedies that Plaintiffs seek are authorized by the Tucker Act, 28 U.S.C.

§ 1491(b)(1), and by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

6.     Due to restrictions on the field of eligible competitors for awards contained in

the Notification of Funding Availability ("NOFA"), each Plaintiff effectively will be

326578.2

precluded from receiving meaningful consideration for certain awards for which they have submitted proposals.

7.      Plaintiffs AHSC and NTHDC have submitted out-of-state proposals, which, under the NOFA, will not be considered if HUD receives a proposal from a legally qualified in-state offeror. *See* Exhibit 3, NOFA, p. 4.  AHSC and NTHDC are out-of-state incumbents of HUD contract administrator awards and would have a substantial chance of receiving an out-of-state award under the NOFA were they allowed to fairly compete for such awards.

8.      Plaintiffs AHSC and CAHI each have submitted a proposal in one or more states where HUD has posted an opinion from the state's attorney general office that concludes only the state's housing finance agency may serve as the HUD contract administrator in that state.  HUD has announced that it will defer to these state attorney general office opinions, effectively resulting in a sole source selection for the award in these states. *See* Exhibit 5, NOFA Q&A #163.  AHSC and CAHI are incumbent HUD contract administrators, and, if allowed to fairly compete for such awards, would have a substantial chance of receiving an award in a state where there is a competition restricting opinion from the state's attorney general office posted to the HUD website.

9.      Plaintiffs have suffered non-trivial competitive injuries from the restrictions on competition contained in the NOFA.  If allowed to fairly compete for HUD contract administrator awards, Plaintiffs would have a substantial chance of receiving such awards.

## **PARTIES**

10.      Plaintiff AHSC is an instrumentality entity of the Columbus (OH) Metropolitan Housing Authority, and has been the contract administrator of HUD's Section 8

3

project-based program in the State of Ohio since 2000. AHSC also has served as the PBCA

in Washington, DC since 2004.

11.     Plaintiff NTHDC is an instrumentality entity of the Tampa (FL) Housing

Authority, and has been the contract administrator of HUD's Section 8 project-based

program for the State of Florida since 2004, and for the U.S. Virgin Islands since 2011.

12.     Plaintiff CAHI is an instrumentality entity of the Oakland (CA) Housing

Authority, and has been the contract administrator of HUD's Section 8 project-based

program for Northern California since 2004.

13.     Defendant is the United States of America, acting by and through the

Department of Housing and Urban Development.

## FACTUAL BACKGROUND

### HUD's Tenant-Based and Project-Based Rental Assistance Programs

14.     HUD supports two main rental assistance programs that are relevant here – the

Tenant-Based Voucher Program (also known as the Housing Choice Voucher Program) and

the Project-Based Program. Both are "Section 8" programs that were created by (or were

continuations of existing programs substantially altered by) the Housing and Community

Development Act of 1974. Exhibit 6, GAO Report 07-290, p. 7. Although both Programs

involve private affordable housing, the Programs' structures and operations are

fundamentally different, particularly with respect to the roles public housing authorities

("PHAs") perform on each Program.

15.     The Project-Based Program and the Tenant-Based Voucher Program appear in

different parts of HUD's structure. The Project-Based Program is overseen by HUD's

Assistant Secretary for Housing-Federal Housing Commissioner, and the governing

4

regulations appear in Chapter VIII of Title 24 of the Code of Federal Regulations. The Tenant-Based Voucher Program is within the purview of HUD's Assistant Secretary for Public and Indian Housing, and the governing regulations are in Chapter of the CFR, 24 C.F.R. Chapter IX.

16.     For purposes of this matter it is important to distinguish between the two Programs. Awards under the NOFA will not be made under the Tenant-Based Voucher Program in which PHAs act as public housing authorities. The NOFA awards will be under the Project-Based Program in which PHAs act as HUD's contract administrators.

**HUD's Section 8 Tenant-Based Voucher Program**

17.     The role of the local PHA is central to the Tenant-Based Voucher Program. "The PHA must have authority to administer the program" once it has established to HUD's satisfaction, through enabling legislation, that it has jurisdiction to perform as a local PHA. 24 C.F.R. §982.51(a)-(b). The PHA establishes its own local policies for the program, so long as they are in accordance with HUD requirements (24 C.F.R. §982.54(a)), and it is the PHA that creates the proposed budget, deciding how to spend the funds it receives; HUD's role is limited to review and approval of the PHA's budget choices. 24 C.F.R. § 982.157.

18.     Under the Tenant-Based Voucher Program, except in limited circumstances, the subsidy follows the low income tenant, and is not tied to particular rental units. (The governing regulations appear at 24 C.F.R Part 982, "Section 8 Tenant Based Assistance: Housing Choice Voucher Program."). It is the PHA that determines tenants' eligibility in accord with its administrative plan and HUD regulations, and it is the PHA that maintains a waiting list of applicants approved to receive rent vouchers. 24 C.F.R. §§982.201, 982.204.

326578.2

19.     Under the Tenant-Based Voucher Program the voucher is essentially a promise from the PHA to the landlord that the PHA will enter into a Housing Assistance Payment ("HAP") contract with the landlord so long as certain conditions are met. The HAP contract amounts make up the difference between the tenant's rental share (typically 30% of his income) and the fair market value of the unit. 24 C.F.R. §982.1(a)(4)(ii).

20.     The tenant to whom the PHA has awarded a rent payment voucher locates a rental unit on the private market with a landlord who is willing to accept the voucher. 24 C.F.R. §982.302(a)-(b). Among other things, the local PHA determines whether the unit is eligible for a subsidy, inspects the unit to ensure that it meets Housing Quality Standards, and determines that the rent to the owner is reasonable. 24 C.F.R. §982.305(a)(1), (2), (4). Under the Tenant-Based Voucher Program, it is the PHA that enters a HAP contract with the landlord to pay the subsidized portion of the rent under the tenant's lease. 24 C.F.R. §982.305(a). HUD has no role in selecting or approving the landlords with whom the HAP contracts are made.

21.     HUD supports the Tenant-Based Voucher Program by providing payments to the PHA, in the form of Annual Contribution Contracts ("ACCs"), to pay for the programs of the local PHAs. 24 C.F.R. §982.151(a)(1). The Tenant-Based Voucher Program ACCs thus include amounts to fund the PHAs for the HAP contracts that the PHAs have chosen to enter into and to cover the PHA's costs in administering its programs.

22.     In sum, the Tenant-Based Voucher Program is the domain of PHAs fulfilling their roles as public housing authorities to engage in providing rental assistance to low income individuals. HUD simply provides a grant to fund the program and sets general regulations as to how the amounts are to be used.

326578.2

**HUD's Section 8 Project-Based Program**

23.     HUD's Project-Based Program consists of several subprograms, the largest of which are the New Construction (24 C.F.R. §880) and Substantial Rehabilitation (24 C.F.R. §881) subprograms.  Under both subprograms, for the private-owner/HUD project at issue here, the governing regulations establish that HUD is responsible for administration of the HAP contract.  24 C.F.R. §880.505(a); 24 C.F.R. §881.503 (cross reference incorporating 24 C.F.R. §880.505).  These regulations further provide that "HUD may contract with another entity for the performance of some or all of its contract administration functions."  24 C.F.R. §880.505(a); 24 C.F.R. §881.503.

24.     In contrast to the Tenant-Based Voucher Program, HUD plays the central role in its Project-Based Program under which the work at issue here will be done.  HUD itself selected the approximately 20,000 covered housing projects that receive subsidies under this Program.  Exhibit 6; GAO Report 07-290, p. 7.  HUD has a longstanding interest in the projects in part because in most instances HUD was involved in financing the project through other of its initiatives, such as its Federal Housing Administration (FHA) loan program.  *Id.;* 24 C.F.R. §880.208.  To increase the nation's stock of low income housing, HUD made or guaranteed loans to private enterprises that would build or substantially rehabilitate existing buildings into low income housing.  The project owners often used the HAP contracts attached to the units as collateral.  *See, e.g.,* 24 C.F.R. §880.208(c).  Thus, HUD has a very real stake in seeing that the properties in the Project-Based Program succeed, *i.e.,* HUD has a particular interest in seeing that the HUD-supported loans are paid off and the properties are used efficiently.  HUD exerts its interest by, for example, retaining to itself the right to

326578.2

approve or deny foreclosures or transfers of the properties in question. 24 C.F.R.
§880.208(d).

25.     Under the basic structure of the Project-Based Program, the PHAs have no
necessary role.  The HAP contract is between HUD and the project owner; the PHA-as-
PBCA is a party to the HAP contract for the limited purpose of serving certain administrative
functions on HUD's behalf.  Exhibit 17, HAP Renewal Contract, p. 4.  Prospective low
income tenants apply directly to the project owners (*i.e.,* landlords) for housing in an assisted
unit.  24 C.F.R. §603(a).  (As in the Tenant-Based Program, the low income tenant will pay
about 30% of their income in rent.  *See, e.g.,* 24 C.F.R. §880.201 (definition of "total tenant
payment"); 24 C.F.R. §5.628(a)(1).)  The project owners are responsible for marketing the
Project-Based Program units (*see, e.g.,* 24 C.F.R. §880.601(a)) and determining the
eligibility of applicants based on their family income and composition.  *See, e.g.* 24 C.F.R.
§§ 880.603(b).  Since 1999, when HUD first chose to engage PHAs to act as PBCAs in order
to provide administrative support for HUD, the role of the PHAs has been both carefully
defined and tightly limited.

26.     HUD's Project-Based Program has multiple subprograms, such as the New
Construction Program under 24 C.F.R. §880 and the Substantial Rehabilitation Program
under 24 C.F.R. §881.  All of these subprograms have a common characteristic that
distinguishes them from the Tenant-Based Voucher Program.  In every part of HUD's
Project-Based Program, it is HUD, not the PHAs, that chooses the projects, and it is HUD,
not the PHAs, that entered into the initial HAP contracts with the project owners.  Unlike the
Tenant-Based Voucher Program, therefore, the Project-Based Program is not one in which

the PHA exercises its role as the local housing authority to select those housing owners that will receive housing assistance payments.

### HUD's Self-Administration of the Project-Based Program, Management Problems, and Outsourcing of the HAP Contract Administration Function in 1999

27.     From the Project-Based Program's inception in 1974 until 1999, HUD used its own network of field offices to perform the HAP contract administration duties on the vast majority of the 20,000 projects in the Program.  Exhibit 6, GAO Report 07-290, p. 10; Exhibit 7, HUD Guidebook for Section 8 Contract Administration Initiative, Introduction. Before 1999, then, PHAs had virtually no role whatsoever with respect to these projects.

28.     That changed because HUD had difficulties with its program management and lacked sufficient resources to manage these projects itself.  In 1998, GAO identified management problems within HUD, including insufficient staffing.  Exhibit 8, GAO Testimony T-RCED-98-185, pp. 2, 5.  Specifically, GAO criticized HUD for its "inadequate staff resources to monitor and administer HUD's current array of programs." *Id.* at 5.

29.     To address this identified flaw in HUD's program management, in its Fiscal Year 2000 Budget Request, HUD requested $209 million to fund a new initiative to outsource contract administration of its Project-Based Program HAP contracts.  Exhibit 9, GAO Testimony T-RCED-99-104, p. 7.

30.     In 2007, GAO described the reasons HUD began outsourcing the contract administration duties of its project-based Section 8 program as follows:

> In 1999, **because of staffing constraints** (primarily in HUD's field offices) and the workload involved in renewing the increasing numbers of rental assistance contracts reaching the end of their initial terms, HUD began an initiative **to contract out the oversight and administration of most of its project-based contracts.**

9

Exhibit 6, GAO Report 07-290 , p. 10 (emphasis added).  GAO went on to explain that HUD

"hired" public housing authorities or state housing finance agencies to perform specified

support services.  *Id.*

31.     HUD's Fiscal Year 2000 Budget Request contains its own description of its

actions.  HUD explained that it proposed to contract out tasks such as "conducting

management and occupancy reviews, ... reviewing owner verification of tenant income and

eligibility, and pre-validating monthly subsidy payments."  Exhibit 10, HUD 2000 Budget

Request, pp. 3-4.  According to HUD, the agency "plan[ned] **to procure the services of**

**contract administrators** to assume many of these specific duties, **in order to release HUD**

**staff for those duties that only government can perform** and to increase accountability for

subsidy payments."  *Id.* at 4 (emphasis added).  HUD also stated:

> The Department would solicit for competitive proposals from
> eligible public agencies to assume these contract administration
> duties... .  The solicitation would specify exact duties,
> performance measures, and the method of selection and award.
> The evaluation would be based upon the respondent's
> capabilities and proposed contract price.

*Id.*

32.     Thus, beginning in 1999, HUD initiated its systematic outsourcing of these

servicing functions for the HAP contracts under the Project-Based Program.  In May 1999,

HUD issued a "Request for Proposals (RFP) for Contract Administrators for Project-Based

Section 8 Housing Assistance (HAP) Contracts," under which the agency sought to

outsource contract administration services for approximately 16,000 project-based assistance

contracts then administered by HUD.  Exhibit 7, HUD Guidebook for Section 8 Contract

Administration Initiative, Introduction.

326578.2

33.     Two years after the Agency began outsourcing HAP contract administration
on its Project-Based Program, HUD requested that an Inspector General revise an audit that
was critical of HUD's failure to conduct on-site monitoring of housing assistance projects.
Specifically, HUD requested that the audit "be revised to better reflect the **implementation
of the PBCA initiative, which has provided positive benefits to reduce overall workload
of [HUD Multi-Family Housing regional field office] staff.**"  Exhibit 11, Audit of [HUD]
Financial Statements for Fiscal Years 2001 and 2000, Management Comments, p. 125
(emphasis added).

34.     HUD awarded contracts to 37 PBCAs in 1999, and to another 16 between
2001 and 2005.  Exhibit 12, Audit: *HUD's Performance-Based Contract Administration
Contract Was Not Cost Effective*, p. 4.  Although the initial PBCA awards were for a term of
not more than 5 years, since their inception HUD has not successfully re-competed the 42
state PBCA contracts at issue here.  *Id.* at 9.

35.     In sum, the contract administration services HUD is securing under the NOFA
is work that HUD self-performed for well over two decades, from 1974 to 1999, and
sometimes longer.  When HUD began to seek help, it did so recognizing its own staffing
limitations and the need to get assistance by contracting out these "contract administrative
duties" by "solicit[ing] for competitive proposals" from third parties using appropriated
funds.  Exhibit 10, 2000 HUD Budget, p. 4.  Moreover, HUD has acknowledged that the
PBCA initiative has had the intended benefit to the Agency of reducing the workload of
HUD's field office staff.  Exhibit 11, p. 125.

11

326578.2

**HUD Continues to Self-Perform the HAP Contract Administration Function on Approximately 4,000 Project-Based Projects**

36.    In 2005, HUD reported that it could not transfer contract administration services to PBCAs for approximately 4,100 Project-Based Program properties that fall under several programs, "because program legislation does not allow appropriated funds to pay fees for contract administration by third-party entities." Exhibit 13, GAO Report 05-224, p. 58 & n. 7.

37.    HUD has stated its intention to self-perform HAP contract administration in states where HUD does not receive a satisfactory application. The NOFA Questions & Answers state, "If there is no qualified applicant for any jurisdiction, HUD will administer the HAP contracts for that state internally, in accordance with past practice and the United States Housing Act of 1937." Exhibit 5, NOFA Q&A #113. This has occurred in states where HUD receives no in-state applications in response to the NOFA, and which, due to their relatively low population, do not attract offers from out-of-state entities. *See* Exhibit 3, NOFA, p. 4. Also, in states in which no applicant attains the minimum technical score of 45 points necessary for award, HUD will perform the work itself rather than solicit other PBCAs. Exhibit 5, NOFA Q&A #113.

**HUD's Previous Attempt to Resolicit PBCA Services**

38.    The NOFA being challenged here is HUD's second attempt to resolicit the PBCA services. In 2011, following HUD's solicitation, styled an "Invitation for Applications" (Exhibit 14), HUD noticed awards in all 53 states (50 states plus the District of Columbia, Puerto Rico, and the U.S. Virgin Islands). Exhibit 15. The Invitation for Applications was silent as to the type of instrument being solicited. Disappointed applicants

in many of the states subject to the current NOFA filed GAO protests of HUD's noticed awards under the Invitation for Applications.

39.     On July 21, 2011, HUD moved to dismiss the protests for a lack of GAO jurisdiction on the grounds that the Invitation for Applications contemplated the award of cooperative agreements and not procurement contracts.  GAO deferred ruling on HUD's motion, and required HUD to defend its award decisions.  Rather than defend its awards, HUD announced that it would take corrective action.  Subsequently, HUD rescinded the noticed awards in states that were subject to protests or where there were multiple applicants, and proceeded with awards only in the 11 states where there was only one applicant and no protest.  Exhibit 16, HUD Statement on Recompeting Project-Based Rental Assistance Contracts); *see* Exhibit 1, GAO Decision, pp. 5-6.

**The 2012 Notice of Funding Availability**

40.     The NOFA challenged here covers the 42 states in which HUD rescinded noticed awards under the Invitation for Applications.  The NOFA consists of the NOFA, the model Performance-Based Annual Contributions Contract at NOFA Appendix C, and the published Questions & Answers that supplement the NOFA.  Relevant excerpts of each of these documents are Exhibits 3, 4 and 5 respectively.

41.     In the NOFA, HUD explicitly states that the Agency is soliciting cooperative agreements.  Exhibit 3, NOFA, p. 7.  But the carefully limited tasks for PBCAs described in the NOFA are simply routine contract administration services in support of HUD's own Project-Based Section 8 programs.

42.     The NOFA's Overview synopsizes the duties that the successful applicant for each State will perform to be "monitoring project owners for compliance ...; ensuring that

13

payments to property owners are calculated accurately and paid in a timely manner; and submitting required documents to HUD." Exhibit 3, p. 3. While the PBCAs perform these unexceptional ministerial tasks, HUD retains the authority under the P-B ACC "to unilaterally amend Exhibit B... to add or withdraw HAP contracts that the PBCA is responsible for administering." *Id.* at p. 8. (Exhibit B to the P-B ACC is a "Portfolio of HAP Contracts" assigned to the PBCA under the P-B ACC. The file, which is an Excel spreadsheet, lists the 14,106 HAP contracts that will be administered by PBCAs in the 42 states where awards have not yet been made. *See* Exhibit 2, HUD NOFA Information Website Home Page (link to "Active PBCA Assigned Section 8 Contracts for NOFA").)

43.   Under the NOFA, HUD tightly controls and funds specific HAP Contracts (*see* Exhibit 17, HAP Basic Renewal Contract, §2(b), p. 2), and HUD precisely dictates the PBCAs' responsibilities. *See* Exhibit 4, P-B ACC, pp. 21-54. The PBCA merely performs enumerated tasks on those HAP Contracts that HUD directs the PBCA to service.

44.   The work required of the PBCA in the performance-based ACC consists of routine contract administration services specified by HUD. The P-B ACC details the eight Performance-Based Tasks ("PBTs") HUD will assign to the PBCA. Exhibit 4, P-B ACC, pp. 23-46. The PBTs are little more than a list of specific duties the PBCA will perform. The PBCA's performance is measured by its compliance with detailed HUD standards for the services the PBCA provides. All of this direction is consistent with PBCAs' working as contractors on HUD's program rather than with their having the discretion to make decisions on programs of their own.

45.   In addition to detailing the eight PBTs that PBCAs must perform, the P-B ACC sets forth HUD's programmatic and administrative objectives in entering into these

326578.2

PBCA agreements. These objectives confirm that HUD is seeking standard administration

services through what are in every significant respect procurement contracts. The

programmatic objectives – including calculating and paying rental subsidies correctly and

administering HAP contracts consistently – detail HUD's reasons for bringing in third parties

to perform administration services in support of its Project-Based Program. Exhibit 4, P-B

ACC, p. 22.

     46.     The administrative objectives include saving money (*id.* ("Get the best value

for dollars spent for PHA services.") and getting the advantage of private sector expertise

and efficiencies in performing the specified tasks formerly done by HUD's own employees.

*Id.* ("Encourage the development of joint venture and or partnerships for contract

administration services to obtain the benefit of the best practices of both public and private

sectors."). These objectives mirror the historical purpose of the move to PBCAs – an attempt

efficiently to relieve HUD field office staff from performing routine HAP contract

administration services on HUD's own Project-Based Program. Exhibit 6, GAO Report 07-

290, p. 10; Exhibit 11, HUD Audit, p. 125.

     47.     HUD actively encouraged the use of private sector subcontractors to perform

the PBCA services. The NOFA's Questions and Answers make clear that PBCAs are free to

subcontract virtually all of the Performance-Based Tasks to private companies, typically IT

and claims processing outsourcing firms. *See* Exhibit 5, Q&A #124 (**"Q.** Please confirm

that the NOFA does not place any limitation on the amount of work which may be contracted

out to another entity. **A.** Correct."); *id.* Q&A #166 (**"Q.** If a subcontractor that will perform

PBTs 1-7 in their entirety has a Disaster Plan that meets HUD's requirements, will HUD

accept it on behalf of the PHA? **A.** Yes.").

326578.2

48.    The solicitation states that HUD will credit the experience of private subcontractors equally with that of PHAs. Exhibit 5, Q&A #46 ("A. The experience of the PHA, the PHA's Instrumentality, and the PHA's contractors will be evaluated without regard for which entity performed the sub-factors. Points will be assigned to the narrative equally for all three entities."). The use of large national firms as subcontractors is so prevalent, in fact, that HUD has eliminated the cap on the number of assisted units any one subcontractor may service. In the 2011 Invitation for Proposals, HUD had limited individual subcontractors to servicing 33% of the total number of such units in HUD's portfolio. Exhibit 14, p. 10. This meant, roughly, that no one subcontractor could service more than 400,000 of the 1.2 million units covered by HUD's 16,000 project-based Section 8 HAP Contracts. *See* Exhibit 20, HUD FY 2013 Budget Summary, Affordable Housing Rental Assistance, p. 5 (stating that HUD's Project-Based Program serves approximately 1.2 million low-income families). The NOFA does not contain even this modest limitation. *See* Exhibit 5, Q&A #1 to ACC for NOFA (following the NOFA Q&A) (first bullet noting that the NOFA contains no limitation on the number of units a contractor may service).

49.    The P-B ACCs fund only the PBCAs' relatively modest administrative fees and not the much larger subsidy payments to project owners. The HUD 2013 budget calls for $8.44 billion in Project-Based rental assistance (most of it in HAP contracts) and only $260 million for PBCAs. Exhibit 20, HUD FY 2013 Budget Summary, Affordable Housing Rental Assistance, p. 5. Also, the PBCAs' administrative fees are capped at 2% of the related HAP contract payments. Exhibit 5, Q&A #119. HUD transfers the Project-Based Program's subsidy payments through the HAP contracts that HUD hires PBCAs to

16

administer.  The PBCAs' role with respect to the subsidies is merely a by-product of the

PBCAs' claims processing role.

50.     HUD's directions as to the mandatory grant applications that PBCAs had to

submit in response to this NOFA expose the relatively modest funds that are really being

provided to PHAs under the P-B ACCs.  Under the NOFA's Application Requirements,

prospective PBCAs must submit Standard Form 424 and HUD Form 2880.  Exhibit 3,

NOFA, p. 19.  SF 424 requires the PBCA to include the amount of "**Estimated Funding**"

(Exhibit 21)); similarly HUD Form 2880 requires the applicant to include the "**Amount of**

**HUD Assistance Requested/Received**."  Exhibit 22.  For both boxes, the NOFA Questions

and Answers require the would-be PBCA to include **only** the amount of Basic

Administrative Fees the entity proposes.  Exhibit 5, Q&A #59 ("**Q.**  Is a specific dollar

amount to be entered into the SF 424, Box 18 and form HUD-2880, line 4? [] **A.**  Yes, this

is the dollar amount of funds (fee) that the applicant anticipates over the 2 year performance

period.  It does not include HAP payment amounts."); *see id.* Q&A ##216, 218.  These

instructions make clear that these "cooperative agreements" are intended to provide PHAs

only the limited administrative fee amount, not the much great HAP payment amounts that

HUD will continue to control.

51.     In the NOFA HUD itself repeatedly refers to the dollars provided to the

PBCAs under the NOFA as a "fee for service."  Exhibit 5, Q&A #79 ("A. [T]he

administrative fee-for-service charges to the PBCA program are used to reimburse the PHAs

for its claim of the overhead costs related to its administration of the program."); Q&A #119

("**A.**  HUD finds any proposed Administrative Fee within the 2% cap set forth in the NOFA

to be a reasonable fee for service, and any portion of the Administrative Fee in excess of the PBCA's costs incurred will be considered non-program income.").

52.     Only the PBCA's profit, if any, from the so-called "Amount of HUD Assistance Requested" potentially would be available to the PHA for its own programs.  But the possibility that the administrative fees may exceed somewhat the PBCA's costs of providing contract administration services to HUD does not make the principal purpose of the P-B ACCs to serve a "funding mechanism to support the PHA's public purpose."  (In contrast, under the Housing Choice Voucher Program, which properly may be considered the PHAs' program, the ACCs transfer amounts covers both the PHAs' administrative fees **and** the HAP contract payment amounts.)

**GAO Bid Protest and HUD's Notice of Its Intention to GAO's Corrective Action Recommendation**

53.     Well before the June 11, 2012 due date for the submission of offers in response to the NOFA, Plaintiffs AHSC and NTHDC and several other PHAs filed pre-award protests with the GAO Bid Protest Unit.  Declaration of Neil H. O'Donnell ¶2.  These protests were consolidated under File No. B-406738 *et seq.*  Plaintiffs AHSC and NTHDC, and others requested that HUD postpone the due date for offers, in order to save the PHAs the expense of preparing their proposals. *Id.* ¶¶ 2-3.  HUD refused to extend the proposal submission date, and instead required PHAs to submit proposals while the GAO bid protest was pending. *Id.* ¶4.

54.     The protesters also argued that the NOFA's restrictions on competition would not pass scrutiny as procurement contracts under the Competition in Contracting Act.  For

18

example, the NOFA adopts an in-state preference that will significantly and unreasonably limit competition.  Exhibit 3, NOFA, p. 4.

55.     Plaintiffs AHSC and NTHDC have submitted out-of-state offers in response to the NOFA in states where in-state offers are expected, due to the states' population densities and past bidding experiences.

56.     Exacerbating this unnecessary limit on competition, HUD effectively has announced that it is open to making awards to the specific statewide housing finance agencies deemed solely eligible by the state attorney general regardless of price, technical capability or demonstrated past performance, so long as the entity meets minimal qualification standards.  Exhibit 5, Q&A #163 ("Second only to the Supreme Court of the state, the Attorney General is top [sic] legal authority on its states [sic] laws.  To the extent that the Attorney General's opinion is on-point and has considered all the relevant facts about any potential in-state applicants (e.g., instrumentalities), HUD will rely on a state's Attorney General's opinions.").  The statewide housing finance agencies are the clients of the respective state attorneys general.  (Links to these letters can be found on HUD's NOFA Website. *See* Exhibit 2, HUD NOFA Information Website Home Page).

57.     Plaintiff AHSC has submitted offers to be the PBCA in multiple states in which the attorney general's office has submitted an opinion to HUD stating that the statewide housing finance agency is the only entity authorized under state law to perform the PBCA services.  Likewise, Plaintiff CAHI has submitted a PBCA offer in the state of California, where an opinion to the same effect has been posted by HUD to the NOFA website.

326578.2

58.     HUD's noticed PBCA awards under the 2011 Invitation for Applications,

which did not contain the in-state preference, demonstrates that HUD's preference in this

NOFA for offers from in-state offerors is a recently imposed restriction on competition. *See*

Exhibit 15 (noticing awards to the Jefferson County (Alabama) Assisted Housing

Corporation in Alabama, Delaware, Mississippi, Rhode Island, and Tennessee; to the

Southwest Housing Compliance Corporation (Austin, Texas) in Arkansas, Colorado, Kansas,

Louisiana, and New Mexico; and to NTHDC in Georgia and the U.S. Virgin Islands).  By

purporting to award cooperative agreements under the NOFA, and not procurement contracts

resulting from an RFP, HUD is attempting to evade the requirements of federal procurement

statutes and regulations that are designed to achieve full and open competition.  Specifically,

HUD has not attempted to justify the NOFA specifications that restrict the field of

competition.

59.     In response to Protestors' Requests for Documents at the GAO in B-406738

HUD admitted that the NOFA does not comply with federal procurement law:

> [I]t is HUD's position that the ACCs are cooperative agreements
> and not subject to federal procurement laws.  The only issue in
> controversy is whether the NOFA properly announced an
> application process for the award of cooperative agreements or
> whether HUD should have issued a solicitation for goods or
> services leading to a procurement contract.   The Agency admits
> it did not follow the requirements in CICA or the FAR.  In the
> event that GAO asserts jurisdiction over the cooperative
> agreement on the grounds that it should have been conducted as
> a procurement, HUD would expect the protest to be sustained.
> Therefore, HUD will not produce documents relating to the
> alleged violations of federal procurement statutes because they
> are not relevant to the sole issue in controversy.

Exhibit 23, HUD June 12, 2012, Letter.

60.     On August 15, 2012, GAO concluded under the controlling statute, the Federal

Grant and Cooperative Agreement Act, 31 U.S.C. §§6301-6308, "that HUD's issuance of a

326578.2

NOFA providing for the award of cooperative agreements was unreasonable and in disregard of applicable statutory guidance." Exhibit 1, GAO Decision, p. 14. GAO also concluded that "HUD is required to use a procurement instrument the results in a contract in order to obtain the provision of contract administration services by PHAs for the Project-Based Section 8 HAP Contracts." *Id.*

61.     Following GAO's decision, HUD extended the terms of the PBCA agreements to accommodate any corrective action HUD determined to take. On November 9, 2012, HUD forwarded a contract amendment to the incumbent Section 8 Project-Based Program contract administrators which extended the term of the existing agreements for three months, to March 31, 2013, and granted HUD options for seven 3-month renewals. Exhibit 24, Email from HUD's Kerry E. Hickman to incumbent contract administrator CEOs. Thus, the amendment enables HUD to extend that PBCA agreement in the recipients' states until September 1, 2014. *Id.* Form contract amendment at p. 4.

62.     On December 3, 2012, HUD announced that it "has decided to move forward with the 2012 PBCA NOFA and plans to announce awards on December 14, 2012." Exhibit 2, p. 1.

### CLAIMS FOR RELIEF

### COUNT I

**(Declaratory Relief – Violation of the Federal Grant and Cooperative Agreement Act)**

63.     Plaintiffs incorporate by reference all of the preceding paragraphs.

64.     Pursuant to the provisions of the Federal Grant and Cooperative Agreement Act, 31 U.S.C. §6303, an executive agency must use a procurement contract when the principal purpose of the instrument is to acquire services for the direct benefit or use of the

326578.2

Case 1:12-cv-00862-TCW   Document 1   Filed 12/11/12   Page 22 of 29

Government. HUD admits that the competition restrictions in the NOFA, and thus awards

made thereunder, do not comply with federal procurement law and regulations for

procurement contracts, including the Competition in Contracting Act, 41 U.S.C. §3301 *et*

*seq.*

65.     Plaintiffs seek a declaration, under APA §706(2)(A), that HUD's issuance of a

NOFA providing for the award of cooperative agreements for PBCA services is unreasonable

and unlawful in that it disregards the requirements of the Federal Grant and Cooperative

Agreement Act, 31 U.S.C. §§6301-6308, and the Competition in Contracting Act, 41 U.S.C.

§3301 *et seq.* and that any awards under that NOFA would be illegal for the same reasons.

## COUNT II

### (Declaratory Relief – Violation Under the Administrative Procedures Act)

66.     Plaintiffs incorporate by reference all of the preceding paragraphs.

67.     The governing regulations of the major subprograms of HUD's Project-Based

Program, the New Construction and the Substantial Rehabilitation subprograms, establish

HUD as the contract administrator of the private-owner/HUD HAP contracts that are subject

to the NOFA. 24 C.F.R. §880.505(a); 24 C.F.R. 881.503. These regulations provide that

"HUD may contract with another entity for the performance of some or all of its contract

administration functions." 24 C.F.R. §880.505(a); 24 C.F.R. 881.503.

68.     Through the PBCA initiative, HUD has exercised its discretion under 24

C.F.R. §880.505(a) and 24 C.F.R. 881.503 by entering into agreements with PHAs to

perform many of HUD's contract administration obligations with respect to Project-Based

Program HAP contracts.

22

326578.2

69.    HUD's issuance of the NOFA, and the terms thereof, is an action "in connection with a procurement" under the Tucker Act, 28 U.S.C. §1491(b)(1).

70.    The NOFA's terms unduly restrict competition by establishing, without justification, an in-state preference that effectively will bar out-of-state offerors, and by establishing evaluation criteria that in many cases will result in sole-source awards to the respective state's housing finance agency.  These restrictions lack a rational basis.

71.    Plaintiffs seek a declaration that HUD's issuance of a NOFA providing for unduly restrictive competition is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law," under APA §706(2)(A), and that any awards under the NOFA would be illegal for the same reasons.

## COUNT III

### (Equitable Relief)

72.    Plaintiffs incorporate by reference all of the preceding paragraphs.

73.    HUD's award of the PBCA work under the NOFA will violate the Federal Grant and Cooperative Agreement Act, the Competition In Contracting Act, applicable provisions of the Federal Acquisition Regulation and will mean that award will have occurred based on restrictions on competition that are unnecessary and for which there is no rational basis.

74.    Plaintiffs will sustain substantial injury if this Court does not permanently enjoin the Agency from moving forward with unlawful awards as well as maintain the status quo pending the resolution of this bid protest in that they will be deprived of the protections afforded by a legal and rationally based procurement.  In particular, the Court's intervention is necessary to prevent these awards going forward without a competition based on full and

326578.2

free completion that would afford each of these Plaintiffs a substantial opportunity for award of one or more contracts.

75.     Because if these awards go forward and awards are made to others without the benefits of required competition, Plaintiffs will be deprived of the opportunity to perform any of these contracts for which they have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

1.     Enter a declaratory judgment holding that HUD's issuance of a NOFA providing for the award of cooperative agreements is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

2.     Enter a declaratory judgment holding that, even under the standards applicable to the solicitation and award of cooperative agreements, the competition restrictions contained in the NOFA are arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law;

3.     Issue a temporary restraining order prohibiting HUD from moving forward with the 2012 PBCA NOFA, including the award of any cooperative agreement until the Court makes a determination on Plaintiffs motion for preliminary injunction;

4.     Issue a preliminary injunction prohibiting HUD from moving forward with the 2012 NOFA, including the award of any cooperative agreement, until such time as the Court enters final judgment on the merits of this action;

5.     Issue a permanent injunction prohibiting HUD from obtaining PBCA services from sources outside the Department using any other device besides a procurement instrument;

6.      Award Plaintiffs their costs, including reasonable attorneys' fees and

expenses;

7.      Grant Plaintiffs such other and further relief as the Court deems just and

proper.

Dated:  December 10, 2012                    Respectfully submitted,


By: _____
            Neil H. O'Donnell (Counsel of Record)

            Dennis J. Callahan
            Jeffery M. Chiow
            Lauren B. Kramer

            ROGERS JOSEPH O'DONNELL
            311 California Street, 10th Floor
            San Francisco, CA 94104
            Tel:  (415) 956-2828
            Fax:  (415) 956-6457
            Email:  nodonnell@rjo.com

            Counsel for Plaintiffs

326578.2

## VERIFICATION

I, Tracey Rudy, declare as follows:

1.    I am a Director of Assisted Housing Services Corporation.

2.    I have personal knowledge of the facts about Assisted Housing Services Corporation and its activities as set forth in the foregoing Complaint and if called on to testify as to these matters would do so competently.

3.    I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 10, 2012, at 880 East 11th Avenue Columbus, OH 43211.

_____
Tracey Rudy, Director
Assisted Housing Services Corporation

Page 1

326707.1

1

2

<u>VERIFICATION</u>

3

4

I, LeeAnn Farner, declare as follows:

5

1.      I am the Contract Administrator for California Affordable Housing

Initiatives, Inc.

6

7

2.      I have personal knowledge of the facts about California Affordable

Housing Initiatives, Inc. and its activities as set forth in the foregoing Complaint and if called

8

on to testify as to these matters would do so competently.

9

10

3.      I verify under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.

11

Executed on December 10, 2012, at Oakland, CA.

12

13

*Lee Ann Farner*

14

LeeAnn Farner, Contract Administrator
California Affordable Housing Initiatives, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

326732.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION

I, Don Shea, declare as follows:

1.     I am the Director of North Tampa Housing Development Corporation.

2.     I have personal knowledge of the facts about HUD's Project-Based Section 8 Program and about North Tampa Housing Development Corporation and its activities as set forth in the foregoing Complaint and if called on to testify as to these matters would do so competently.

3.     I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 10, 2012, at __Tampa, Florida_____.

Don Shea, Director
North Tampa Housing Development Corporation

Page 1

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

| | |
|---|---|
| ASSISTED HOUSING SERVICES CORP.; NORTH TAMPA HOUSING DEVELOPMENT CORP.; CALIFORNIA ASSISTED HOUSING INITIATIVES, INC., ) ) ) ) ) | Case No. _____ |
| Plaintiffs, ) ) | |
| v. ) ) | |
| THE UNITED STATES, ) ) | |
| Defendant, | |

### CERTIFICATE OF SERVICE

        I hereby certify that I have caused to be delivered by electronic means, on this 10th day of December, 2012, copies of (1) the Verified Complaint, (2) Declaration of Neil H. O'Donnell, with accompanying exhibits, (3) Plaintiffs' Application for a Temporary Restraining Order, (4) Proposed Temporary Restraining Order, (5) Motion for a Preliminary Injunction, (6) Proposed Order Granting Preliminary Injunction, (7) Memorandum in Support of Plaintiffs' Application for a Temporary Restraining Order and Motion for a Preliminary Injunction, (8) Plaintiffs' Corporate Disclosure Statement, and (9) Notice of Directly Related Case, on the following counsel:

Ms. Kasey Podzius, Esq. (by email kasey.m.podzius@hud.gov)
Trial Attorney, U.S. Department of Housing & Urban Development
Office of General Counsel
451 7th St., SW, Room 8142
Washington, DC 20410

U.S. Department of Justice (by email to nationalcourts.bidprotest@usdoj.gov)
U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, DC 20530

_____
[Name of Sender]

326565.1